**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| VARONIS SYSTEMS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>MATTHEW GUANCIALE, CYERA US INC., and DAVID SCHMID<br><br>Defendants. | C.A. No. 1:25-cv-00571-GBW<br><br>Judge Gregory B. Williams |

# THIRD AMENDED COMPLAINT

Pursuant to Fed. R. Civ. P. 15(a)(2) and D. Del. LR 15.1, Plaintiff Varonis Systems, Inc. ("Varonis" or the "Company") brings this action against Defendants Matthew Guanciale ("Guanciale"), a former employee of Varonis, Cyera US Inc. ("Cyera" and with Guanciale and Schmid, "Defendants"), his new employer and a direct competitor of Varonis, and David Schmid ("Schmid"), another former employee of Varonis who has joined Cyera. Varonis seeks injunctive relief based on Guanciale's and Schmid's breaches of their post-employment nondisclosure obligations and damages from all Defendants for their trade secret misappropriation.[1] Varonis alleges as follows:

[1] The Court's October 14, 2026 Order (Doc. 86) dismissed with prejudice the non-compete, non-solicitation, and non-interference portions of Counts I and II (breach of contract), but the non-disclosure aspects of those claims remain. The Court dismissed Count IV (Delaware Uniform Trade Secrets Act Claim) without prejudice, allowing Varonis to re-plead relevant state-law trade secrets claims. Counts V and VI (tortious interference with Schmid's and Guanciale's contract, respectively) were dismissed with prejudice. The Court struck Count VII (tortious interference with other employment agreements). The claims dismissed with prejudice have been removed from the Third Amended Complaint. Those claims, and the dismissed portions of Counts I and II, are omitted here solely to comply with the Court's Order. Varonis does not abandon or waive these claims or any right to seek reconsideration, appellate review, or other further review of the Order's dismissal of those claims or its striking of Count VII. Varonis expressly reserves all such rights.

## THE PARTIES

1. Varonis is a Delaware corporation with its principal place of business in Miami, Florida.

2. Upon information and belief, Guanciale is a resident of Land O'Lakes, Florida.

3. Guanciale is a former employee of Varonis.

4. Cyera is a Delaware corporation with its principal place of business in New York, New York.

5. Cyera is Guanciale's new employer and Varonis's direct competitor.

6. Upon information and belief, Schmid is a resident of Peachtree City, Georgia.

7. Schmid is a former employee of Varonis.

8. Cyera is Schmid's new employer and Varonis's direct competitor.

## JURISDICTION

9. The Court has personal jurisdiction over Guanciale and Schmid because Varonis seeks injunctive relief arising from Guanciale's and Schmid's breaches of their respective At-Will Employment, Confidential Information, Invention Assignment and Arbitration Agreements ("Employment Agreement" or "Employment Agreements") with Varonis. In their Employment Agreements, Guanciale and Schmid expressly consented to the personal and exclusive jurisdiction of the state and federal courts located in New Castle County, Delaware, over claims related to their Employment Agreements. A true and correct copy of Guanciale's Employment Agreement is attached as **Exhibit 1**. A true and accurate copy of Schmid's Employment Agreement is attached as **Exhibit 2**.

10. The Court has general personal jurisdiction over Cyera because Delaware is its state of incorporation.

11. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (actions arising under the laws of the United States) as this action arises, in part, under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq*.

12. The Court has supplemental jurisdiction over the state-law claims in this action pursuant to 28 U.S.C. § 1367, as each of the claims in this action are so closely related that they form part of the same case or controversy.

13. Venue is properly laid in this Court pursuant to 28 U.S.C. § 1391(b) because Gianciale and Schmid expressly consented to the venue of the state and federal courts located in New Castle County, Delaware over claims related to their Employment Agreements. Venue is also proper for defendant Cyera because it is incorporated in Delaware and therefore subject to this Court's personal jurisdiction under 28 U.S.C. § 1391(b)(3).

## FACTUAL ALLEGATIONS

### I. Varonis's business requires protections of its confidential and trade secret information.

14. Varonis is a pioneer in data security and analytics. Varonis focuses on protecting enterprise data—sensitive files and emails; confidential customer, patient, and employee data; financial records; strategic and product plans; and other intellectual property.

15. Varonis's data security platform detects cyber threats from internal and external actors by analyzing data, account activity, and user behavior. It helps prevent and mitigate risks by securing sensitive data while maintaining a secure environment through automation.

16. Varonis's products address additional important use cases, including data protection, data governance, Zero Trust architecture, compliance, data privacy, classification, and threat detection and response.

17. The market for security management solutions is very competitive.

18. Varonis maintains internal, permission-controlled roadmap repositories in SharePoint that describe upcoming product capabilities, the platforms Varonis supports, architectural changes, feature enhancements, and projected release timelines. Critically, these repositories also contain non-public information regarding perceived gaps and shortcomings in Varonis's current products.

19. These non-public materials typically extend a strategic vision over 12 months and, in certain situations, may include longer terms. The internal roadmap contains forward-looking information that goes well beyond what is publicly disclosed, reflecting not only the specific features and products Varonis intends to release, but also the Company's broader strategic direction.

20. Access to this repository is permission-controlled and restricted to employees with a business need. Guanciale (and Schmid, as discussed below) had access to this roadmap information on an ongoing basis because it was necessary for them to carry out their job functions as Sales Engineers.

21. Knowledge of this non-public roadmap information, if disclosed to a competitor, would allow a competitor to accelerate competing features, preemptively position itself against upcoming Varonis releases, and attempt to undermine customer confidence before those features are released.

22. In addition to the roadmap, Sales Engineers are exposed to non-public operational and technical information regarding how Varonis's software functions in customer environments, including architectural design choices, deployment requirements, system permissions necessary for certain features, integration dependencies, and other internal product considerations that are not disclosed in marketing materials. Through extensive internal training and field experience, Sales Engineers learn how to navigate these technical considerations during customer engagements

and enterprise security reviews, including how to accurately position the product and address customer inquiries based on Varonis's internal knowledge and processes.

23. Sales Engineers are also aware of user interface distinctions between product lines, and areas where functionality is still being enhanced. Beyond this, Sales Engineers learn in detail how Varonis's software actually operates "under the hood," including how it must be installed, what permissions it requires to function, what systems it depends on, and how it connects with other software used by customers. They understand what technical conditions must be in place, what level of system access is required for certain features to work, and where areas are still being improved.

24. While Varonis publicly describes its product capabilities, it does not disclose the internal operational details regarding how its software is deployed, configured, integrated, and optimized within customer environments, or how those engagements are managed during enterprise evaluations and implementations. That knowledge is developed internally through training sessions, engineering collaboration, internal documentation, and experience accumulated across hundreds of enterprise deployments, at significant expense.

25. A competitor in possession of this knowledge could more effectively target Varonis's perceived weaknesses, anticipate Varonis's responses in customer-facing situations, and adjust its own product and sales strategy to gain an unfair competitive advantage.

26. This type of knowledge is not publicly compiled or available in the marketplace; it reflects internal operational experience and institutional knowhow developed over many years. Tenured Sales Engineers like Guanciale and Schmid, who spent years conducting enterprise evaluations and managing complex deployments, accumulated precisely this type of non-public operational knowledge during their employments with Varonis.

27. Varonis has developed a structured, non-public methodology for selling its enterprise data security software to large enterprise customers. This includes a defined sequence for how to introduce the product, identify a customer's security risks, run a 30-day trial evaluation, present findings to executive stakeholders in a customized presentation format, and advance opportunities to close. This evaluation process is not improvised but follows a proprietary, defined sequence that is specific to Varonis's products and not a generic sales approach.

28. As part of this methodology, Varonis trains its Sales Engineers to use a particular sales framework (referred to internally as a "challenger" approach) in which the Sales Engineer educates the customer, reframes how the customer views its security risks, and guides the discussion toward areas where Varonis's product is strongest.

29. The details of this methodology—including the requirements before beginning an evaluation, the technical validation steps performed, the structure of executive presentations, techniques for addressing objections, and strategies for navigating large corporate accounts—are not publicly disclosed. They are taught through internal training sessions, enablement materials, and on-the-job experience accumulated over more than 20 years and hundreds of transactions.

30. Guanciale and Schmid were both trained using this methodology and had access to these materials during their employments with Varonis.

31. If disclosed to a competitor, this methodology could be used to copy Varonis's process, anticipate how Varonis runs its sales cycle, and interfere with that process by targeting Varonis's strengths or exploiting its challenges.

32. Varonis maintains internal competitive intelligence materials stored in restricted repositories including Highspot, Varonis University (the Company's internal learning management platform), and internal SharePoint and Microsoft Teams channels, accessible only to

employees with a business need. These materials include "battle cards," which are non-public competitive positioning documents that identify how Varonis differentiates itself from specific competitors, including Cyera, and how to address head-to-head competitive scenarios in the field.

33. In addition, Varonis maintains internal "win documents"—non-public deal debriefs summarizing how Varonis positioned itself to win specific competitive situations, including customer-specific information and strategies—as well as internal win analyses and lessons learned from competitive engagements.

34. These materials also include non-public internal assessments of Varonis's own strengths and weaknesses and guidance on how to navigate specific competitive threats.

35. Both Guanciale and Schmid had access to these materials during their employments, including competitive materials specific to Cyera.

36. This information is not publicly available, was developed by Varonis's marketing organization at significant expense over many years, and derives independent economic value from not being generally known to competitors.

37. Varonis maintains confidential information regarding prospective customers and active sales opportunities in internal systems including Salesforce (its customer relationship management system, or "CRM") and restricted SharePoint team repositories. This information includes the identity of prospective customers and specific contacts actively evaluating Varonis's software, the stage of the sales cycle and evaluation status, approximate contract value, pricing information, the customer's specific security concerns and internal decision-makers, and Varonis's competitive positioning within each account. Varonis also maintains non-public, competitively sensitive information regarding its reseller and channel partner relationships, including the identities of key partners, the nature and history of those relationships, prior sales outcomes involving particular

partners, and Varonis's strategic approach to working with those partners in future opportunities.

38. Access to this information is limited to personnel with a business need, including Sales Engineers, account executives, and sales leadership, and it is not publicly available. Varonis expends substantial financial and personnel resources to generate these sales opportunities, including marketing investment, business development efforts, and technical evaluations.

39. Knowledge of which specific customers are in an active evaluation phase, including their budget range, internal decision-makers, and Varonis's pricing flexibility within that account, would provide a competitor like Cyera with a significant unfair advantage — enabling it to target those same accounts, undercut pricing, or disrupt a nearly completed transaction at the most effective moment.

40. Guanciale and Schmid had access to this information during their employments with Varonis and used it to perform their job duties.

41. Varonis's pricing strategies and cost structures are non-public and confidential. Varonis's licensing and pricing strategies includes Varonis's cost structures, the pricing flexibility available to secure new transactions or facilitate the renewal of contracts with specific customers, and the parameters and circumstances under which Varonis could offer additional discounts. This information is stored within Salesforce and account-specific repositories on a need-to-know basis, and is not publicly available.

42. Through their roles, Guanciale and Schmid acquired in-depth knowledge of pricing strategies and cost structures. They were also aware of the amounts individual customers were willing to pay.

43. This pricing knowledge, if used by or disclosed to a competitor, would enable the competitor to strategically price its products in a manner designed to undercut Varonis's

established business relationships with specific accounts.

44. Thus, Varonis has developed and owns certain valuable trade secrets, including: (a) the content of Varonis's internal, permission-controlled product roadmap repositories in SharePoint, including information on upcoming product capabilities, architectural changes, feature enhancements, projected release timelines, and perceived gaps and shortcomings in current products; (b) non-public information regarding internal product limitations, architectural challenges, technical friction points, operational installation requirements, and known workarounds, as developed through internal training and field experience and not disclosed in marketing materials; (c) Varonis's proprietary structured sales methodology and evaluation process, including its 30-day evaluation framework, the sequence for conducting and presenting evaluations to executive stakeholders, its internally-developed "challenger" sales framework, and techniques for navigating objections and closing enterprise deals; (d) internal competitive intelligence materials, including "battle cards" specific to individual competitors including Cyera, "win documents" summarizing successful competitive situations, and internal assessments of Varonis's and its competitors' strengths and weaknesses, stored in restricted systems including Highspot and Varonis University; (e) confidential prospective customer and active pipeline information, including the identity of prospective customers in active evaluations, their stage in the sales cycle, approximate contract value, internal decision-makers, security concerns, and Varonis's pricing flexibility within specific accounts, maintained in Salesforce and restricted SharePoint repositories; and (f) Varonis's pricing strategies, cost structures, discount parameters, and customer-specific pricing flexibility, and information on Varonis's reseller and channel partners, including the identities of key partners, the strength and history of those relationships, prior wins and losses involving specific partners, and strategic positioning for future opportunities.

45. Each of these categories consists of specific non-public information developed at significant expense, protected by access controls and confidentiality obligations, and deriving independent economic value from not being generally known to competitors, and Guanciale and Schmid had access to these materials during their employments with Varonis.

## II. Defendant Guanciale joins Varonis and accepts post-employment obligations to protect and prevent the misuse of Varonis's confidential business information.

46. Varonis employed Guanciale from on or about May 21, 2018, the date of his hire, until March 18, 2025. On March 11, 2025, Guanciale informed his manager, Scott Shafer, that he intended to begin employment at Cyera, Varonis's direct competitor. He also communicated this same information to the Account Managers he worked with, Gus Osorio and Richard Haddad. On March 17, 2025, Guanciale officially submitted his resignation from Varonis with two weeks' notice. Given the threat posed by Guanciale's employment with a competitor, Varonis decided to exit him immediately, and his last date of employment was March 18, 2025.

47. During his time at Varonis, Guanciale held various leadership roles within the company's management team.

48. For years, Guanciale was a Sales Engineer and played a key role in assisting Account Managers and partners with the technical aspects of Varonis's products and services for new and preexisting customers, which was critical to cultivating customer relationships and converting them into sales of Varonis's products and services. Later, as a Sales Engineering Team Lead and Manager, Guanciale oversaw a team of Sales Engineers, helping them with their sales campaigns and customer management activities in order to ensure a high rate of success. Additionally, as a Sales Engineering Team Lead and Manager, Guanciale collaborated with sales management to identify new sales opportunities and improve the sales engineering methodology. Guanciale also served as a Strategic Sales Engineer, where Guanciale also managed some of Varonis's most

important customers and prospective clients.

49. In these roles, Guanciale spent years acquiring in-depth knowledge of Varonis's products, gaining a thorough understanding of their strengths, competitive challenges, and the Company's product roadmap—insights developed through extensive internal training, including dedicated training conferences.

50. As a condition of his employment, Guanciale reviewed and accepted his Employment Agreement, including all obligations set forth therein. Among other obligations to Varonis, Guanciale was required to immediately provide Varonis with an executed Termination Certification should his employment with Varonis ever end.

51. The Termination Certification, an executed version of which Guanciale was supposed to provide Varonis upon his separation, represents that Guanciale, among other things, will honor his continuing post-employment legal obligations to Varonis, including protecting its confidential business information against misappropriation or to benefit a third party and refraining from using or disclosing Varonis's confidential information.

52. Specifically, the Termination Certification states, in relevant part, the following:

> I further agree that, in compliance with the [Employment Agreement], I will preserve as confidential and will not use or disclose without prior authorization any and all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

Ex. 1, Ex. A; *see id.* § 6.

53. The Termination Certification also requires Guanciale to identify his new employer, describe his position, and list his general responsibilities immediately upon separation. This

information is necessary for Varonis to assess Guanciale's compliance with his post-employment non-disclosure obligations owed to Varonis.

54. To date, Guanciale has failed and/or refused to complete and provide the Termination Certification to Varonis, although Varonis sent him such Termination Certification requesting him to sign it post-separation.

55. In accepting his Employment Agreement, Guanciale expressly recognized that Varonis is engaged in a competitive business, that he would have access to confidential information, customers, and business relationships that he otherwise would not have, and the use or misuse of such information and relationships to the benefit of any party other than Varonis would disadvantage Varonis and damage the Company immeasurably. *See id.* § 7(C).

56. Guanciale acknowledged the valuable nature of Varonis's confidential information and agreed that an injunction is an appropriate remedy to protect such confidential information because of the harm a breach of his Employment Agreement would cause Varonis. As such, Guanciale acknowledged the following:

> I agree that any party may also petition the court for injunctive relief where either party alleges or claims a violation of this agreement or any other agreement regarding trade secrets, confidential information, non-competition, non-solicitation, non-interference or other restrictive covenants. I understand that any breach or threatened breach of such an agreement will cause irreparable injury and that money damages will not provide an adequate remedy therefor and both parties hereby consent to the issuance of an injunction. In the event the Company has a good faith basis for seeking injunctive relief, the Company shall be entitled to recover reasonable costs and attorneys' fees.

*Id.* § 12(D) (capitalization omitted).

57. Further, as part of his Employment Agreement, Guanciale agreed to provide a written notification to Varonis identifying the name, address, and position with his new employer along with a general description of his duties, at least five business days before starting any new

employment; he has not done so despite starting a new position at Cyera. *Id.* § 7(A).

## III. Guanciale had access to Varonis's trade secrets through his work.

58. From the start of his employment until his resignation, Guanciale was deeply involved in and had extensive access to the confidential information and trade secrets described in Paragraphs 18 through 45 above.

59. Guanciale worked for Varonis as a Sales Engineer and later as a Strategic Sales Engineer, both before and after his time as a Sales Engineering Team Lead and Manager. In this initial role, he worked with Account Managers and partners with the technical aspects of commercial activities, both for new and existing opportunities. Additionally, Guanciale worked with the sales team to understand customer needs and offer technical solutions, present and demo Varonis products to potential and existing customers, including presentations to C-Level stakeholders, create and present technical proposals including plans and integration strategies, advise customers on best practices for data security, cloud computing, and cybersecurity, develop sales strategies and account plans, keep up with industry trends and emerging technologies to position Varonis solutions, provide customer feedback to further product development, attend industry events including conferences to promote Varonis and build expertise, work with sales to exceed targets, integrate Varonis solutions into a customer's environment, and enhance the technical expertise of partners. Later as a Strategic Sales Engineer, Guanciale was responsible for the client management of important existing and potential customers.

60. Guanciale gained access to and knowledge of even more of Varonis's confidential information in his role as Sales Engineering Team Lead and Manager. As part of this role, he presented and sold Varonis's products and services to strategic or key current and potential customers, formulated sales strategies, and collaborated with sales management to identify

opportunities to improve upon and standardize best practices. Guanciale was also responsible for overseeing the team of Sales Engineers in this management position, supporting them in their sale engineering work and customer management activities, assessing customer information, identifying and addressing problem areas, formulating relevant solutions, and presenting solutions effectively.

61. Guanciale's role was also customer-facing, which provided Guanciale with direct access to and intimate knowledge of Varonis's confidential sales and technical information.

62. Guanciale played a key role in Varonis's efforts to expand its share in the space where Cyera competes. As a Sales Engineer, Sales Engineering Team Lead and Manager, and Strategic Sales Engineer, Guanciale had extensive access to the specific categories of confidential information and trade secrets described in Paragraphs 18 through 45 above. This sensitive information, if revealed to a competitor, could severely harm Varonis.

63. To secure its confidential business information, Varonis invests in and deploys multiple means to manage, control, and restrict access to its systems. Varonis has layers of complex permission systems that are each managed in a different way. The Company's security measures restrict the individuals who have access to particular aspects of the Company's business.

64. In order to perform his duties, Guanciale had access to sensitive and confidential information and a thorough understanding of such information, allowing him to further Varonis's business interests. Throughout his yearslong tenure at Varonis, Guanciale also gained knowledge of sensitive information while performing his duties, contributing to and/or being a key source of certain protected confidential business data—such as insights gained from managing direct relationships with important customers, prospective customers, and partners.

## IV. Guanciale is positioned to exploit his connections to Varonis's customer relationships, which are critical to maintaining Varonis's competitive position.

65. Guanciale had a customer-facing position where he worked with Varonis's Account Managers and customers' technical subject-matter experts to pursue new business for the Company as well as manage relationships with customers related to their existing business with Varonis. More recently in his role as Strategic Sales Engineer, he also managed relationships with important existing and prospective customers.

66. Given the breadth of experience working with Account Managers, other Sales Engineers, and Company Sales leadership, Guanciale developed intimate knowledge of Varonis's business operations. If Cyera were to gain access to this knowledge, it could jeopardize Varonis's business by disclosing sensitive business information to Cyera—a direct competitor that could then exploit Guanciale's knowledge to its competitive advantage.

## V. Guanciale has access to, relationships with, and knowledge of wide-ranging confidential information concerning Varonis's customers and prospects, as well as Varonis's strategies to cultivate and maintain relationships.

67. As a result of his customer-facing role, Guanciale gained extensive knowledge of Varonis's customers' technological business needs and preferences, in addition to acquiring highly detailed and technical information about Varonis's products, product developments, and competitive strategies. This combination of insights uniquely positions Guanciale to harm Varonis's business interests. Guanciale acknowledged this as well in his Employment Agreement:

> I further acknowledge and agree that the identity of the Customers is not readily ascertainable or discoverable through public sources, and that the Company's list of Customers was cultivated with great effort and secured through the expenditure of considerable time and money by the Company.

Ex. 1 § 7(B)(1).

68. Over seven years, Guanciale acquired in-depth knowledge of Varonis's licensing

and pricing strategies, including Varonis's cost structures and the pricing flexibility available to secure new transactions or facilitate the renewal of contracts with specific customers.

69. As a key player in many of Varonis's deals, Guanciale was aware of the parameters and circumstances under which Varonis could offer its customers additional discounts. By virtue of Guanciale's knowledge of the amounts customers were willing to pay, as well as Varonis's pricing strategies and discount structures, Cyera is now positioned to strategically price its products to Varonis's customers and prospective customers in a manner that undermines and undercuts Varonis's established business relationships. Guanciale gained much of this knowledge by collaborating closely with the Varonis sales team to understand its customer needs and contribute to the development of account plans aimed at achieving revenue goals.

70. Guanciale is also intimately familiar with the precise timing of when customer contracts with Varonis are due for renewal because he worked closely with those customers, the specific products those customers utilized, and the identities of former customers who no longer purchase from Varonis. As such, he is uniquely positioned to both target specific customers and time his efforts to exploit vulnerable moments when customers are most susceptible to being solicited by a competitor like Cyera.

71. Varonis expends substantial resources in gathering, analyzing, and developing critical information regarding the specific needs, preferences, and pricing expectations of its customers and prospective customers. This includes understanding when opportunities may arise for new transactions or renewals. The unauthorized use, disclosure, or misappropriation of such sensitive information would result in significant harm to Varonis, undermining its competitive position as a leader in the data security and analytics industry.

**VI. Guanciale has privileged access to and extensive knowledge of Varonis's products and products in development that he can use to position Cyera's products against Varonis, as well as to assist Cyera to identify market opportunities and develop features tailored to Varonis's customers and prospects.**

72. By virtue of his positions as Sales Engineer, Sales Engineering Team Lead and Manager, and Strategic Sales Engineer, Guanciale was deeply involved in the sales of security products customized for existing and prospective customers, including Varonis's most important customers. Given that he worked with the sales team including Account Managers and partners, Guanciale understands Varonis's customer needs and was highly exposed to customer feedback throughout the sales process, as well as with customers post-sale. Through this process, Guanciale also gained knowledge of Varonis's procedures and protocols for providing technical support and after-sales services to the Company's customers. Customers and prospective customers also regularly disclosed sensitive, non-public information about their information systems and particular business needs. With that information, Guanciale and Varonis's sales engineers presented demonstrations of the Company's products tailored to address each customers' specific needs.

73. As part of this sales process, Guanciale educated customers and other Varonis employees about Varonis's capabilities. The Company relied on Guanciale's credibility and technical expertise in Varonis's data security solutions. In fact, Guanciale regularly conducted technical trainings to other key Varonis employees and partners. For that reason, Guanciale has access to and knowledge of Varonis's trade secrets. Namely, specialized technical information about Varonis's products and product pipeline, as well as the Company's business plans and strategies.

74. Guanciale, therefore, possesses privileged access to detailed information about the capabilities of Varonis's products services—indeed, he was responsible for demonstrating the products' functions, integrated Varonis solutions into a customer's environment, trained other employees on Varonis's technology including key partners, and had in-depth technical knowledge to

competently address customers' and prospects' questions about them.

75. Guanciale's in-depth knowledge about Varonis's products and how to use them also means he knows the challenges that Varonis's products are facing, information which Guanciale can convey to Cyera now that he works there, to strengthen Cyera's products and pitch when competing with Varonis's products for a customer. This information is highly confidential, proprietary, and constitutes Varonis's trade secrets.

76. By being part of a team that secured deals with new customers, Guanciale was also responsible for maintaining and cultivating customer relationships. Due to his role in deployment, Guanciale served as a channel through which Varonis learned how customers used its data security tools, learned the purpose for which these tools were used, obtained feedback on the Company's products, obtained information on technical issues reported by customers, and obtained information on Varonis product features that customers did not use or needed.

77. This resulted in Guanciale directly receiving and accessing information regarding the specific needs of current and prospective customers, as addressed by Varonis's offerings and those of its competitors.

78. Guanciale relayed all this information to Varonis's lead technical team to resolve issues identified by customers as well as strategize and identify functionalities to test, shelve, or develop.

79. Due to Guanciale's role in a team that secured and maintained customer relationships, so that he could address customers' business needs, Varonis educated Guanciale about the Company's near-term, immediate term, and long-term product roadmap.

80. Through meetings and other updates with key employees, the sales team, and partners, Guanciale was apprised of the Company's current and future product pipeline.

81. At the time of his separation from employment, Guanciale had (and continues to have) knowledge of the Company's product roadmap.

82. Guanciale can use his knowledge about what functionalities customers need, how and/or for what purpose customers use security features, and what capabilities those customers are expected to need as their businesses grow or mature, which he learned solely through his employment with Varonis.

## VII. As the nexus between Varonis and its customers and partners, Guanciale's work with Cyera presents as a unique risk given the combination of access to and knowledge of Varonis's key relationships.

83. In his roles as Sales Engineer, Sales Engineering Team Lead and Manager, and Strategic Sales Engineer, Guanciale was one of the primary faces of Varonis for many of the Company's customers, including Varonis's most important customers. This enables Guanciale to position Cyera to compete against Varonis products and gain a greater share of the market, as well as to leverage his credibility as a former insider and exploit his knowledge about the purported challenges of Varonis's products to the advantage of Cyera.

84. Guanciale's in-depth, technical knowledge of the strengths and weaknesses of Varonis's products uniquely positions Guanciale to damage the Company's business and competitive advantage. Guanciale can identify what Varonis's products can and cannot do and how Varonis positions itself against competitors, including Cyera, as well as guide Cyera on selling against Varonis and developing Cyera's products to exploit Varonis's limitations.

85. Coupled with Guanciale's relationships with Varonis's customers, Guanciale can compound the damage he is causing to Varonis by developing Cyera's sales teams and sales capabilities, in competition with Varonis, using sensitive technical and confidential business information he acquired from his unique positions at Varonis.

**VIII. Guanciale resigns to join a direct competitor.**

86. On March 11, 2025, Guanciale informed his direct manager, Scott Shafer, that he intended to resign and would be joining Cyera. On March 17, 2025, Guanciale submitted his resignation from Varonis with two weeks' notice. Sam Wethje, Vice President of North America Sales, initially spoke to Guanciale and then Greg Pomeroy, Senior Vice President of Worldwide Sales, spoke to him. While Shafer urged him to reconsider his decision to leave Varonis, Pomeroy decided to immediately exit Guanciale on March 18, 2025, in lieu of Guanciale's two weeks' notice.

87. On March 19, 2025, Varonis Human Resources sent an email to Guanciale providing him with administrative information related to his separation. The email attached a letter to Guanciale acknowledging his resignation and reminding him of his post-employment obligations to Varonis, which included providing his completed Termination Certification with information in writing about his new position and a general description of his new role. On the same day, Guanciale viewed the Termination Certification at 1:05 p.m. through an online electronic signature platform called DocuSign. Despite receiving and viewing the Termination Certification, to date, he has failed to complete and submit this document to Varonis despite beginning employment with Cyera.

88. On March 21, 2025, Varonis's legal counsel emailed Guanciale a letter reminding him of his continuing post-employment obligations to Varonis under his Employment Agreement and that he is prohibited from disclosing or using Varonis's confidential and sensitive business information other than for Varonis's benefit. A true and correct copy of Varonis's counsel's March 21, 2025 letter is attached as **Exhibit 3**.

89. The March 21, 2025 letter also informed Guanciale that Varonis considers Cyera

to be a competitor, and that Guanciale's employment with Cyera both constitutes a breach of his Employment Agreement and threatens the misappropriation of Varonis's confidential information.

90. Varonis asked that Guanciale confirm to Varonis, by March 25, 2025, that he has not disclosed any Varonis Confidential Information to any unauthorized recipient. Guanciale did not respond to Varonis's letter and remains employed by Cyera.

91. Guanciale's employment with Cyera as a Senior Sales Engineer commenced in April 2025.

92. Cyera knew of Guanciale's post-employment obligations to Varonis before hiring him. Varonis put Cyera on notice of this in a cease and desist letter dated March 19, 2025, in which Varonis specifically advised Cyera that Guanciale's employment would constitute a violation of the restrictive covenants in his Employment Agreement. A true and correct copy of Varonis's March 19, 2025 letter is attached as **Exhibit 4**. Cyera responded to Varonis's letter on March 28, 2025. Counsel for Varonis and Cyera continued to communicate on the issues involving Guanciale for several weeks thereafter without reaching a resolution.

93. Cyera knowingly and intentionally employed and has continued to employ Guanciale in direct violation of the restrictive covenants contained in his Employment Agreement.

94. Cyera has encouraged and induced Guanciale to violate the restrictive covenants contained in his Employment Agreement by hiring and employing him in a position that is both substantially similar to his former position at Varonis and competes with Varonis.

95. Cyera has continued employing Guanciale, notwithstanding the March 19, 2025 letter and its own prior acknowledgment of the Employment Agreement between Guanciale and Varonis, which prohibits Guanciale from seeking employment with any of Varonis's direct competitors.

**IX. Cyera's business**

96. Founded in 2021, Cyera styles itself as a leader in data security and data security posture management ("DSPM").

97. Cyera is a relatively new entrant to the market of data security and DSPM, and it is a direct competitor to Varonis in this area, which is Varonis's main activity.

98. Cyera also offers various tools and functions for organizations to secure data in their cloud-based environments, on-premises environments including functions that are similar to those available from Varonis's products.

99. Many prospective customers who are looking for the functions and services provided by Varonis would also look at Cyera's products that provide similar functions or alternative measures to Varonis's security management tools.

**X. Defendant Guanciale's employment with Cyera violates his restrictive covenants.**

100. Guanciale joined Cyera as a Senior Sales Engineer, a position just like the one he held at Varonis. In this capacity, Guanciale is performing many of the same functions that he performed for Varonis as a Sales Engineer, Sales Engineering Team Lead and Manager, and Strategic Sales Engineer—namely, to drive sales of data security solutions, now in the service of Cyera products, against which Varonis competes.

101. To date, Guanciale has provided no reply to Varonis's March 21, 2025 letter, despite updating his LinkedIn profile to show that he is now a Senior Sales Engineer at Cyera. Guanciale has also provided no written notification of the identity of his new employer or a general description of his duties, pursuant to his Employment Agreement.

102. Guanciale has also not confirmed his intent to honor his post-employment obligations, including his non-disclosure obligation, to Varonis.

103. By signing his Employment Agreement, Guanciale acknowledged that Varonis operates in a competitive industry. Through his role, training, and experience at the Company, Guanciale gained access to Varonis's confidential information and built relationships with its customers and business partners. Guanciale further recognized that disclosing or misusing this confidential information would cause significant harm to the Company and put Varonis at a severe competitive disadvantage:

> I acknowledge and agree that
>
> (1) the business in which the Company is engaged is intensely competitive,
>
> (2) my employment by the Company will require me to have access to, and knowledge of, Company Confidential Information, which is of vital importance to the success of the Company,
>
> (3) I will derive significant value from the Company's agreement to provide me with Company Confidential Information to enable me to optimize the performance of my duties to the Company,
>
> (4) the disclosure or improper use of any Company Confidential Information could place the Company at a serious competitive disadvantage and could do it serious damage, financial and otherwise,
>
> (5) I will develop relationships with clients and business partners at the time and expense of the Company,
>
> (6) by my training, experience and expertise, my services to the Company are extraordinary, special and unique,
>
> (7) my fulfillment of the obligations contained in this Agreement is necessary to protect the Company Confidential Information and, consequently, to preserve the value and goodwill of the Company,
>
> (8) the time, geographic and scope limitations of my restrictive covenant obligations are fair and reasonable in all respects, especially in light of the Company's need to protect Company Confidential Information and the international scope and nature of the Company's business, and
>
> (9) I will not be precluded from gainful employment by abiding by the restrictions in this Agreement.

Ex. 1 § 7(C) (line breaks added).

**XI. Varonis's imminent, irreparable harm**

104. Guanciale's duties and responsibilities on behalf of Cyera by its nature are inherently likely to lead to Guanciale violating his Employment Agreement, and inevitably result in the use or disclosure of Varonis's confidential business information and plans.

105. Guanciale occupies a similar position at Cyera to the one he held at Varonis, performing similar functions. As a Senior Sales Engineer at Cyera, he plays an important role in driving revenue growth, much like his role at Varonis. His key responsibilities at Cyera include diagnosing and addressing customer business challenges, designing tailored solutions, delivering compelling proof-of-value presentations and use case demonstration at customer sites, consulting with key stakeholders, leading technical demonstrations, coordinating internal resources through cross-functional collaboration, supporting the development of a scalable and repeatable business model, acting as the primary technical contact, and representing Cyera at key marketing events. These functions are nearly identical to those Guanciale performed at Varonis, as a Sales Engineer, Sales Engineering Team Lead and Manager, and Strategic Sales Engineer.

106. If Guanciale is allowed to continue his employment with Cyera in violation of his Employment Agreement, it will cause irreparable harm to Varonis. Once lost, Varonis's confidential and trade secret information cannot be restored. The nature of the losses that would occur over time if Varonis's confidential and trade secret information were disclosed to Cyera or used to help it in competing with Varonis and/or developing a competing business, cannot be fully quantified or fully measured.

107. Since Matthew Guanciale's departure from Varonis in March 2025 and his commencement of employment as a Senior Sales Engineer at Cyera in April 2025, Varonis has suffered concrete competitive harm in at least two enterprise sales opportunities for which Guanciale served

as the managing Sales Engineer during his Varonis tenure.

108. First, in an enterprise opportunity, Varonis maintained an active relationship with a prospective customer beginning in approximately September 2024, completed an extended evaluation process in or around June 2025. This required substantial Sales Engineering resources and close engagement with the prospective customer over several months.

109. In September 2025, the prospective customer informed Varonis that it had elected to proceed with Cyera. The projected value of the Varonis opportunity was approximately $500,000. Guanciale was the Sales Engineer managing this account when he was a Varonis employee.

110. Second, in another enterprise opportunity, Varonis completed an evaluation process lasting approximately six months. The projected value of that opportunity was approximately $850,000 under Varonis's pricing structure.

111. In May 2025, shortly after Mr. Guanciale's departure, the prospective customer elected to purchase from Cyera at a lower price point. The Varonis evaluation process in that opportunity required significant technical and personnel investment. Guanciale was the Sales Engineer managing this account when he was a Varonis employee.

112. Once a Varonis evaluation is successfully completed, particularly after several months of structured engagement, the likelihood of closing a deal is high. However, in both of these instances, Varonis had advanced substantially in the sales cycle—completing full structured evaluations requiring months of Sales Engineering time, technical configuration, data analysis, and executive-level presentations—before the customer elected to proceed with Cyera.

113. Guanciale, as the managing Sales Engineer on both accounts, possessed detailed knowledge of those customers' security concerns, budget ranges, internal decision-makers,

evaluation status, and Varonis's pricing flexibility within each account, as well as Varonis's non-public product roadmap, competitive positioning strategies, internal product limitations, and proprietary sales methodology.

114. These losses, occurring shortly after Guanciale's departure to Cyera with access to Varonis's roadmap, competitive analysis, sales methodology, and pricing exposure, is consistent with competitive harm resulting from Varonis's confidential and trade secret information being disclosed or used by Cyera.

115. The economic harm to Varonis from these opportunities includes not only lost revenue but also diminished competitive positioning.

**XII. Defendant Schmid joins Varonis and accepts post-employment obligations to protect and prevent the misuse of Varonis's confidential business information.**

116. Varonis employed Schmid from December 9, 2019, until April 22, 2025, when Schmid resigned and gave his two weeks' notice to his manager, Scott Shafer. Given the sensitive nature of the confidential information to which Schmid had access, Varonis determined that it was in the best interest of the Company to terminate his employment immediately. Consequently, Schmid's last day of employment was April 22, 2025.

117. Schmid served as a Sales Engineer from December 9, 2019 to August 1, 2023, playing a key role in assisting Account Managers and partners with the technical aspects of Varonis's products and services for both new and existing customers. This role was critical in cultivating customer relationships and converting them into sales. Later, when Schmid was promoted to Senior Sales Engineer, he additionally managed some of Varonis's most important customers and prospective customers.

118. In these roles, Schmid, too, spent years acquiring in-depth knowledge of Varonis's products, gaining a thorough understanding of their strengths, competitive challenges, and the

company's product roadmap—insights developed through extensive internal training, including dedicated training conferences.

119. Like Guanciale, as a condition of his employment, Schmid, too, reviewed and accepted his Employment Agreement, including all obligations set forth therein. Schmid, like Guanciale, was also required to immediately provide Varonis with an executed Termination Certification should his employment with Varonis end.

120. The Termination Certification, which Schmid was supposed to provide upon his separation, represents that he will honor his continuing post-employment legal obligations to Varonis. This includes protecting its confidential business information against misappropriation or use to benefit a third party and refraining from using or disclosing Varonis's confidential information. Ex. 2, Ex. B; *see id.* § 6.

121. The Termination Certification also requires Schmid to identify his new employer, describe his position, and list his general responsibilities immediately upon separation. This information is necessary for Varonis to assess Schmid's compliance with his post-employment obligations.

122. To date, Schmid has failed to review, complete, and provide the Termination Certification to Varonis, despite Varonis sending the document electronically post-separation.

123. In accepting his Employment Agreement, Schmid also expressly recognized that Varonis operates a competitive business, that he would have access to confidential information, customers, and business relationships that he otherwise would not have, and that misuse of such information and relationships would disadvantage and damage the Company immeasurably.

124. Schmid acknowledged the valuable nature of Varonis's confidential information and agreed that an injunction is an appropriate remedy to protect such information because of the

harm a breach of his Employment Agreement would cause Varonis. He acknowledged: "I agree that any party may also petition the court for injunctive relief where either party alleges or claims a violation of this agreement or any other agreement regarding trade secrets . . . I understand that any breach or threatened breach . . . will cause irreparable injury [.]" *Id.* § 12(D) (capitalization omitted).

125. Further, as part of his Employment Agreement, Schmid also agreed to provide written notification to Varonis identifying the name, address, and position with his new employer, along with a general description of his duties, at least five business days before starting any new employment. He has not done so despite starting a new position at Cyera as a Senior Sales Engineer.

**XIII. Schmid had access to Varonis's trade secrets through his work.**

126. From the start of his employment until his resignation, Schmid, like Guanciale, was deeply involved in and had extensive access to the confidential information and trade secrets described in Paragraphs 18 through 45 above.

127. Schmid worked for Varonis as a Sales Engineer, where he worked with Account Managers and partners on the technical aspects of commercial activities, both for new and existing opportunities. Additionally, Schmid worked with the sales team to understand customer needs and offer technical solutions, present and demo Varonis products to potential and existing customers, including presentations to C-Level stakeholders, create and present technical proposals including plans and integration strategies, advise customers on best practices for data security, cloud computing, and cybersecurity, develop sales strategies and account plans, keep up with industry trends and emerging technologies to position Varonis solutions and products, provide customer feedback, attend industry events, work with sales, integrate Varonis solutions into a customer's environment,

and enhance the technical expertise of partners. Later as a Senior Sales Engineer, Schmid was responsible for the client management of important, existing and potential customers. Schmid's roles were both customer-facing.

128. Schmid, like Guanciale, played a key role in Varonis's efforts to expand its share in the space where Cyera competes. As a Sales Engineer and later as Senior Sales Engineer, Schmid had extensive access to the specific categories of confidential information and trade secrets described in Paragraphs 18 through 45 above. This sensitive information, if revealed to a competitor, could severely harm Varonis.

129. To secure its confidential business information, Varonis invests in and deploys multiple means to manage, control, and restrict access to its systems. Varonis has layers of complex permission systems that are each managed in a different way. The Company's security measures restrict the individuals who have access to this confidential information.

130. In order to perform his duties, Schmid also had access to sensitive and confidential information and a thorough understanding of such information. Throughout his five years at Varonis, Schmid also gained knowledge of sensitive information while performing his duties, contributing to or being a key source of certain protected confidential business data—such as insights gained from managing direct relationships with important customers, prospective customers, and partners.

## XIV. Schmid, like Guanciale, is positioned to exploit his connections to Varonis's customer relationships, which are critical to maintaining Varonis's competitive position.

131. Schmid held customer-facing roles at Varonis, collaborating with Account Managers and Varonis's technical experts to drive new business and manage existing relationships. In his position as Senior Sales Engineer, he was responsible for maintaining and developing relationships with key existing and prospective customers.

132. During his tenure at Varonis, Schmid worked extensively with Account Managers, Sales Engineers, and senior Sales leadership, gaining in-depth knowledge of Varonis's internal business operations—including strategic initiatives, sales methodologies, and customer engagement practices. This confidential information is highly sensitive, and Varonis takes significant measures to protect it. If disclosed or used by a competitor like Cyera, it would pose a serious risk to Varonis's competitive advantage.

**XV. Schmid had access to confidential customer information and strategic relationship management practices at Varonis.**

133. Through his customer-facing roles, Schmid acquired extensive knowledge of Varonis's customers' technological needs and preferences. He also gained detailed insights into Varonis's products, product developments, and competitive strategies. This unique combination of customer and product knowledge positions Schmid to harm Varonis's business interests. Schmid acknowledged the confidential nature of this information in his Employment Agreement. *See* Ex. 2 § 7(B)(1).

134. Over five years, Schmid gained extensive knowledge of Varonis's pricing strategies, cost structures, and discount practices. His insights into customer payment thresholds and Varonis's pricing flexibility now enable Cyera to undercut Varonis's pricing and target its customers, threatening Varonis's business relationships. Schmid gained much of this knowledge by collaborating closely with the Varonis sales team during the five years he was with the Company.

135. Schmid has detailed knowledge of Varonis's customer renewal schedules, the products they use, and the identities of former customers. This positions him to strategically target and solicit customers for Cyera at their most vulnerable moments. Varonis has invested significant resources in developing this customer intelligence, and any unauthorized use of this information would severely harm its competitive standing as a leader in the data security and analytics industry.

Compounding to Varonis's harm is Cyera's recent employment of two key former Varonis employees—Guanciale and Schmid.

**XVI. Schmid's privileged access to Varonis's product development and customer strategies enables Cyera to tailor its offerings to directly compete with Varonis and exploit market opportunities.**

136. In his roles as Sales Engineer and Senior Sales Engineer, Schmid was deeply involved in the sales of security products customized for existing and prospective customers, including Varonis's most important customers. In his roles, he collaborated closely with Varonis's sales teams and most important customers, gaining deep insight into customer needs, product customization, and technical support protocols. Customers and prospective customers also regularly disclosed sensitive, non-public business information, which he and Varonis Sales Engineers used to tailor product demonstrations to their specific requirements.

137. Schmid, therefore, possesses privileged access to detailed information about the capabilities of Varonis's products and services—indeed, he was responsible for demonstrating the products' functions, integrating Varonis solutions into a customer's environment, and had in-depth technical knowledge to competently address customers' and prospects' questions about them.

138. Schmid's in-depth knowledge about Varonis's products and how to use them also means he knows the challenges that Varonis's products are facing, information which Schmid can convey to Cyera now that he works there, to strengthen Cyera's products and pitch when competing with Varonis's products for a customer. This information is highly confidential, proprietary, and constitutes Varonis's trade secrets.

139. In his most recent role as Senior Sales Engineer, Schmid collaborated with the sales team on transactions involving both prospective and existing Varonis customers. Through his work in helping acquire new business and managing key customer relationships, he gained deep insight

into Varonis's most significant accounts.

140. Through his roles as Sales Engineer and Senior Sales Engineer, Schmid directly engaged with current and prospective customers, gaining detailed insights into their specific needs as addressed by Varonis's offerings and those of its competitors. He communicated this information to Varonis's technical teams to resolve customer issues and to strategize on product functionalities to test, develop, or discontinue.

141. To effectively address customer business needs, Varonis also provided Schmid with comprehensive knowledge of its short-term and long-term product roadmaps. Regular meetings with key employees, sales teams, and partners kept Schmid informed about the company's current and future product pipelines. At the time of his departure, Schmid, like Guanciale, retained knowledge of Varonis's product roadmap.

142. Schmid also understood the functionalities customers required, how they utilized security features, and the capabilities they expected to need as their businesses evolved—information acquired solely through his employment at Varonis.

143. In his roles, Schmid served as a primary representative of Varonis to many of its customers, including the most important ones. His positions at Varonis enables him now to leverage his insider knowledge to position Cyera competitively against Varonis's products, potentially capturing greater market share. His credibility as a former insider and awareness of Varonis's product challenges also serve to advantage Cyera. Schmid's deep technical understanding of Varonis's product strengths and weaknesses also positions him to influence Cyera's strategies, including product development and competitive positioning. Combined with his relationships with Varonis's most important customers, Schmid could further impact Varonis by enhancing Cyera's sales capabilities using sensitive, technical, and confidential business information acquired during

his tenure at Varonis.

**XVII. Schmid resigns to join a direct competitor.**

144. On April 22, 2025, Schmid submitted his resignation with two weeks' notice. At that time, he did not inform Varonis that he would be joining a direct competitor. In fact, he expressly stated that he was not going to be joining Cyera.

145. Given the sensitive nature of the confidential information to which Schmid had access, Varonis determined that it was in the best interest of the Company to terminate his employment immediately. Consequently, Schmid's last day of employment was April 22, 2025.

146. The next day, on April 23, 2025, Varonis Human Resources sent Schmid an email acknowledging his resignation and reminding him of his post-employment obligations.

147. During the first week of May, Varonis discovered that Schmid began employment with its direct competitor, Cyera—directly contradicting his express statement to Varonis that he would not be joining Cyera—when Schmid updated his employment information on LinkedIn. His new position as Senior Sales Engineer at Cyera is the exact same position that he last held at Varonis.

148. On May 5, 2025, Varonis's legal counsel sent Schmid a letter reiterating his obligations under his Employment Agreement, including the confidentiality clause. The letter also stated that Varonis considers Cyera a competitor and that Schmid's employment with Cyera breaches his Employment Agreement and risks misappropriation of confidential information. Varonis requested confirmation by May 9, 2025, that Schmid had not disclosed any confidential information. This letter was also mailed to Cyera. Schmid did not respond. He remains employed by Cyera as a Senior Sales Engineer, where he has been since May 2025.

149. Varonis did not consent to Schmid's employment with Cyera or release him from

his obligations under his Employment Agreement. At Cyera, Schmid holds the same position he last held at Varonis, performing comparable functions that directly compete with Varonis's offerings.

150. Schmid has not responded to Varonis's communications regarding his new employment or confirmed his intent to honor his post-employment obligations. By signing his Employment Agreement like Guanciale, Schmid, too, acknowledged the competitive nature of Varonis's industry and the importance of maintaining the confidentiality of its information. He recognized that misuse of confidential information could cause significant harm to Varonis and agreed to abide by reasonable restrictions to protect the Company's interests.

**XVIII. Varonis suffers imminent, irreparable harm.**

151. Schmid's role at Cyera is inherently likely to lead to violations of his Employment Agreement, including the use or inevitable disclosure of Varonis's confidential business information. His current position at Cyera mirrors his former role at Varonis, involving similar responsibilities that could leverage Varonis's proprietary information.

152. Allowing Schmid to continue in this capacity at Cyera poses a risk of irreparable harm to Varonis, as the loss of confidential and trade secret information cannot be undone, and the resulting damages are difficult to quantify.

153. Since Schmid's departure from Varonis in April 2025 and his commencement of employment as a Senior Sales Engineer at Cyera in May 2025, Varonis has suffered concrete competitive harm in at least two enterprise sales opportunities for which Schmid served as the managing Sales Engineer during his Varonis tenure.

154. First, in an enterprise financial services opportunity, Varonis ultimately secured a customer in November 2025 but was required to provide a substantial discount following

competitive pressure from Cyera. Cyera's involvement materially affected Varonis's pricing posture in that deal.

155. Schmid was the Sales Engineer managing this account when he was a Varonis employee.

156. Second, in one enterprise opportunity, Varonis had secured a post-evaluation commitment from a customer in June 2025 and was awaiting final executive sign-off. In July 2025, the customer unexpectedly requested to restart portions of the evaluation. Varonis was later informed that the customer elected to proceed with Cyera. The projected value of that opportunity was approximately $280,000.

157. Schmid was the Sales Engineer managing this account when he was a Varonis employee.

158. The timing of these losses and pricing deviations, occurring shortly after Schmid's departure to Cyera with access to Varonis's roadmap, competitive analysis, sales methodology, and pricing exposure, is consistent with competitive harm resulting from Varonis's confidential and trade secret information being disclosed or used by Cyera. The economic harm to Varonis from these opportunities includes not only lost revenue but also diminished competitive positioning.

**COUNT I**
**(Breach of Contract against Defendant Guanciale)**

159. Varonis restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

160. Varonis has in place agreements with Guanciale, specifically his Employment Agreement, which impose restrictions on Guanciale's disclosure of certain information learned during his employment with Varonis.

161. By accepting and commencing employment with Cyera, a competitor of Varonis, and in a job that requires violating Guanciale's ongoing contractual obligation to protect and not use or disclose the confidential information about Varonis's business, Guanciale is in breach of his Employment Agreement.

162. As a result of such conduct, and unless Guanciale is enjoined from continuing such conduct and from remaining employed with Cyera, Varonis will continue to suffer irreparable and incalculable harm, including the loss of proprietary and confidential information for which it can never be compensated. No adequate remedy at law exists for such a breach.

163. By virtue of his conduct, Guanciale has breached his obligations under his Employment Agreement and should be required to disgorge all sums and benefits that he received from breaching his Employment Agreement.

**COUNT II**
**(Breach of Contract against Defendant Schmid)**

164. Varonis restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

165. Varonis has in place agreements with Schmid, specifically his Employment Agreement, which imposes restrictions on Schmid's disclosure of certain information learned during his employment with Varonis.

166. By accepting and commencing employment with Cyera, a competitor of Varonis, and in a job that requires violating Schmid's ongoing contractual obligation to protect and not use or disclose the confidential information about Varonis's business, Schmid is in breach of his Employment Agreement.

167. As a result of such conduct, and unless Schmid is enjoined from continuing such conduct and from remaining employed with Cyera, Varonis will continue to suffer irreparable and

incalculable harm, including the loss of proprietary and confidential information for which it can never be compensated. No adequate remedy at law exists for such a breach.

By virtue of his conduct, Schmid has breached his obligations under his Employment Agreement and should be required to disgorge all sums and benefits that he received from breaching his Employment Agreement.

**COUNT III**
**(Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.***
**Against All Defendants)**

168. Varonis restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

169. The Defend Trade Secrets Act prohibits the misappropriation of trade secrets.

170. The specific trade secrets at issue are identified in Paragraphs 5 through 30 above, which are incorporated herein by reference, and include: (a) Varonis's internal, permission-controlled product roadmap repositories in SharePoint; (b) non-public information regarding internal product limitations, architectural challenges, and technical friction points; (c) Varonis's proprietary structured sales methodology and evaluation process, including its 30-day evaluation framework and 'challenger' sales approach; (d) internal competitive intelligence materials including 'battle cards' specific to individual competitors including Cyera, 'win documents,' and internal competitive assessments stored in Highspot and Varonis University; (e) confidential prospective customer and active pipeline information, including the identity of prospective customers in active evaluations, their stage in the sales cycle, approximate contract value, internal decision-makers, security concerns, and Varonis's pricing flexibility within specific accounts, maintained in Salesforce and restricted SharePoint repositories; and (f) Varonis's pricing strategies, cost structures, discount parameters, and customer-specific pricing flexibility, and information on Varonis's

reseller and channel partners, including the identities of key partners, the strength and history of those relationships, prior wins and losses involving specific partners, and strategic positioning for future opportunities.

171. Varonis's trade secrets have independent economic value because they are not generally known to the public and are not readily ascertainable.

172. Varonis has taken reasonable measures to safeguard its trade secrets, including requiring its employees to sign confidentiality and non-disclosure agreements, implementing and enforcing internal policies stressing the confidentiality of its information, restricting access to sensitive information, terminating data platform access for departing employees, and issuing written reminders to departing employees regarding their continuing obligations to maintain confidentiality.

173. Cyera's current employees Guanciale and Schmid gained access to highly sensitive Varonis trade secrets solely through their employment with Varonis. The nature of Guanciale's and Schmid's former positions at Varonis provided both of them with certain proprietary information, specifically, technical knowledge of Varonis's products and services, competitive analyses, customer information, marketing and sales strategies, and product development roadmaps discussed above, all of which constitute Varonis's trade secrets.

174. Given the substantial similarity between Guanciale's and Schmid's prior responsibilities at Varonis and their new roles at Cyera as Senior Sales Engineers, and considering the competitive nature of the market, the use or disclosure of Varonis's trade secrets by Guanciale and Schmid at Cyera is not only likely, but inevitable.

175. As a receiver and beneficiary of this information, Cyera, too, threatens to misappropriate Varonis's trade secrets, qualifying Varonis for injunctive relief under 18 U.S.C.

§ 1836(b)(3)(A), which authorizes courts to enjoin "any actual or threatened misappropriation" of trade secrets.

176. Cyera's employ of Guanciale and Schmid under these circumstances, constitutes actual and/or threatened misappropriation in violation of 18 U.S.C. § 1836(b)(1).

177. As a direct and proximate result of Cyera's, Guanciale's, and Schmid's unlawful conduct, Varonis has suffered and will continue to suffer the following: (1) loss of confidential and proprietary information and trade secrets, (2) the lost value derived from Varonis's investment in substantial resources to develop confidential information that gives Varonis an advantage over its competitors, (3) irreparable harm, including loss of competitive advantage, (4) loss of goodwill and market share, and (5) other economic damages.

**COUNT IV**
**(Violation of the Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001, *et seq.***
**Against Defendants Cyera and Guanciale)**

178. Varonis restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

179. The Florida Uniform Trade Secrets Act (FUTSA), Fla. Stat. § 688.001, *et seq.*, prohibits the actual or threatened misappropriation of trade secrets.

180. Varonis owns and has developed trade secrets, including but not limited to: (a) Varonis's internal, permission-controlled product roadmap repositories in SharePoint; (b) non-public information regarding internal product limitations, architectural challenges, and technical friction points; (c) Varonis's proprietary structured sales methodology and evaluation process, including its 30-day evaluation framework and 'challenger' sales approach; (d) internal competitive intelligence materials including 'battle cards' specific to individual competitors including Cyera, 'win documents,' and internal competitive assessments stored in Highspot and Varonis University; (e)

confidential prospective customer and active pipeline information, including the identity of prospective customers in active evaluations, their stage in the sales cycle, approximate contract value, internal decision-makers, security concerns, and Varonis's pricing flexibility within specific accounts, maintained in Salesforce and restricted SharePoint repositories; and (f) Varonis's pricing strategies, cost structures, discount parameters, and customer-specific pricing flexibility, and information on Varonis's reseller and channel partners, including the identities of key partners, the strength and history of those relationships, prior wins and losses involving specific partners, and strategic positioning for future opportunities.

181. These trade secrets derive economic value from not being generally known or readily ascertainable by others.

182. Varonis has taken reasonable steps to protect the secrecy of its trade secrets, including requiring employees to sign confidentiality and non-disclosure agreements, enforcing internal access restrictions, limiting information sharing on a need-to-know basis, terminating employee system access immediately upon departure, and issuing written reminders of continuing confidentiality obligations.

183. Guanciale, Cyera's new employee, hired as a Senior Sales Engineer, formerly held a key position at Varonis where he had access to Varonis's trade secrets. After his employment at Varonis, Guanciale subsequently accepted a substantially similar role at Cyera, a direct competitor.

184. Guanciale acquired knowledge of Varonis's trade secrets under circumstances that created a duty to maintain the secrecy of such information and to limit its use. *See* Fla. Stat. § 688.002(2)(b)(2).

185. Guanciale's new position at Cyera as Senior Sales Engineer is substantially similar to his prior role at Varonis, and the competitive relationship between Varonis and Cyera is so

direct, that the use or disclosure of Varonis's trade secrets is inevitable.

186. Cyera, as the recipient and employer of individuals with knowledge of Varonis's trade secrets, either has misappropriated or threatens to misappropriate those trade secrets. *See* Fla. Stat. § 688.003(1).

187. Guanciale is a conduit of this information, and either has misappropriated or threatens to misappropriate Varonis's trade secrets.

188. Cyera knew or had reason to know that Guanciale's knowledge of Varonis's trade secrets was acquired under circumstances giving rise to a duty to maintain their confidentiality, and that the use of them in Guanciale's new role would be improper. That is because Cyera is a sophisticated market competitor in the data security space where they themselves impose such confidentiality obligations on their own key employees with access to trade secrets. After all, it is common industry practice. Moreover, Guanciale's position at Cyera as a Senior Sales Engineer mirrors the position he held at Varonis. Given the similarity in roles and the nature of the confidential information Guanciale possesses, Cyera knew or should have known employing Guanciale risked inevitable disclosure and improper use of Varonis's trade secrets.

189. Guanciale's acquired knowledge of Varonis's trade secrets after he signed his Employment Agreement, which obligated him to maintain the confidentiality of Varonis's trade secrets.

190. As a direct and proximate result of Cyera's actual and/or threatened misappropriation of Varonis's trade secrets, Varonis has suffered and will continue to suffer irreparable harm, including loss of its competitive advantage, customer relationships, and confidential business information.

**COUNT V**
**(Violation of the Georgia Uniform Trade Secrets Act, O.C.G.A. § 10-1-760, *et seq.* Against Defendants Cyera and Schmid)**

191. Varonis restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

192. The Georgia Uniform Trade Secrets Act (GUTSA), O.C.G.A. § 10-1-760, *et seq.*, prohibits the actual or threatened misappropriation of trade secrets.

193. Varonis owns and has developed trade secrets, including but not limited to: (a) Varonis's internal, permission-controlled product roadmap repositories in SharePoint; (b) non-public information regarding internal product limitations, architectural challenges, and technical friction points; (c) Varonis's proprietary structured sales methodology and evaluation process, including its 30-day evaluation framework and 'challenger' sales approach; (d) internal competitive intelligence materials including 'battle cards' specific to individual competitors including Cyera, 'win documents,' and internal competitive assessments stored in Highspot and Varonis University; (e) confidential prospective customer and active pipeline information, including the identity of prospective customers in active evaluations, their stage in the sales cycle, approximate contract value, internal decision-makers, security concerns, and Varonis's pricing flexibility within specific accounts, maintained in Salesforce and restricted SharePoint repositories; and (f) Varonis's pricing strategies, cost structures, discount parameters, and customer-specific pricing flexibility, and information on Varonis's reseller and channel partners, including the identities of key partners, the strength and history of those relationships, prior wins and losses involving specific partners, and strategic positioning for future opportunities.

194. These trade secrets derive economic value from not being generally known or readily ascertainable by others.

195. Varonis has taken reasonable steps to protect the secrecy of its trade secrets, including requiring employees to sign confidentiality and non-disclosure agreements, enforcing internal access restrictions, limiting information sharing on a need-to-know basis, terminating employee system access immediately upon departure, and issuing written reminders of continuing confidentiality obligations.

196. Schmid, Cyera's new employee, hired as a Senior Sales Engineer, formerly held a key position at Varonis where he had access to Varonis's trade secrets. After his employment at Varonis, Schmid subsequently accepted a substantially similar role at Cyera, a direct competitor.

197. Schmid acquired knowledge of Varonis's trade secrets under circumstances that created a duty to maintain the secrecy of such information and to limit its use. *See* O.C.G.A. § 10-1-761(2)(b)(ii).

198. Schmid's new position at Cyera as Senior Sales Engineer is substantially similar to his prior role at Varonis, and the competitive relationship between Varonis and Cyera is so direct, that the use or disclosure of Varonis's trade secrets is inevitable.

199. Cyera, as the recipient and employer of individuals with knowledge of Varonis's trade secrets, either has misappropriated or threatens to misappropriate those trade secrets. *See* O.C.G.A. § 10-1-762(a).

200. Schmid is a conduit of this information, and either has misappropriated or threatens to misappropriate Varonis's trade secrets.

201. Cyera knew or had reason to know that Schmid's knowledge of Varonis's trade secrets was acquired under circumstances giving rise to a duty to maintain their confidentiality, and that the use of them in Schmid's new role would be improper. That is because Cyera is a sophisticated market competitor in the data security space where they themselves impose such

confidentiality obligations on their own key employees with access to trade secrets. After all, it is common industry practice. Moreover, Schmid's position at Cyera as a Senior Sales Engineer mirrors the position he held at Varonis. Given the similarity in roles and the nature of the confidential information Schmid possesses, Cyera knew or should have known employing Schmid risked inevitable disclosure and improper use of Varonis's trade secrets.

202. Schmid's acquired knowledge of Varonis's trade secrets after he signed his Employment Agreement, which obligated him to maintain the confidentiality of Varonis's trade secrets.

203. As a direct and proximate result of Cyera's actual and/or threatened misappropriation of Varonis's trade secrets, Varonis has suffered and will continue to suffer irreparable harm, including loss of its competitive advantage, customer relationships, and confidential business information.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Varonis Systems, Inc. respectfully requests that judgment be made and entered against Matthew Guanciale, David Schmid, and Cyera as follows:

(1) A preliminary injunction and permanent injunction, whereby Guanciale and Schmid would be enjoined from:

(a) possessing, using, disclosing, or disseminating any confidential data or trade secrets belonging to Varonis that were created, discovered, used or tested, or being developed, by Varonis during Guanciale's and Schmid's employments there, unless generally known in the trade or industry in which Varonis is engaged or ascertained from public or published information; and

(b) any other action in violation of Defendants Schmid's and Guanciale's contractual obligations or fiduciary duties owed to Varonis;

(2) A judgment in Varonis's favor and against Guanciale and Schmid, holding them liable for Varonis's reasonable costs and attorney's fees incurred by Varonis in seeking injunctive

relief against Guanciale and Schmid pursuant to their Employment Agreements;

(3) A judgment in Varonis's favor and against all Defendants, holding them liable for damages stemming from their violation of the Defend Trade Secrets Act, under § 1836(b)(3)(B), together with interests, costs, attorney's fees, punitive damages, and injunctive relief under §§ 1836(b)(3)(A)(i) and 1836(b)(3)(A)(ii) to prevent Defendants from disclosing Varonis's trade secrets;

(4) A judgment in Varonis's favor and against Defendants, holding them liable for damages stemming from their violation of the Georgia Uniform Trade Secrets Act (O.C.G.A. § 10-1-760, *et seq.*) and the Florida Uniform Trade Secrets Act (Fla. Stat. § 688.001, *et seq.*), together with interests, costs, attorney's fees, exemplary damages for willful and malicious appropriation, and injunctive relief under O.C.G.A. § 10-1-762(a) and Fla. Stat. § 688.003(1) to prevent Defendants from disclosing Varonis's trade secrets; and

(5) Judgment granting Varonis such other and further relief as the Court may deem just, equitable, and proper against both Defendants.

POTTER ANDERSON & CORROON LLP

By: /s/ John A. Sensing
Timothy R. Dudderar (No. 3890)
John A. Sensing (No. 5232)
Hannah L. Paxton (No. 7096)
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19801
(302) 984-6000 – Telephone
tdudderar@potteranderson.com
jsensing@potteranderson.com
hpaxton@potteranderson.com

*Attorneys for Plaintiff Varonis Systems, Inc.*

OF COUNSEL:
(*pro hac vice*)

Kim R. Walberg, Esq.
Benjamin S. Morrell, Esq.
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Suite 2600
Chicago, IL 60601-4208
(312) 836-4164 – Telephone
kwalberg@taftlaw.com
BMorrell@taftlaw.com
NMinor@taftlaw.com

Dated: November 4, 2026